USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/17/2021____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
EUGENE NEWELL,                                          :
                                                        :
              Plaintiff,                                :
                                                        :
        -against-                                       :        19-CV-10831 (JLC)
                                                        :
ANDREW M. SAUL,                                         :
Commissioner, Social Security Administration,           :
                                                        :
              Defendant.                                :
                                                        :
-------------------------------------------------------------------X


**OPINION & ORDER**

TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................ 1

  A.   Procedural Background ................................................................... 1

  B.   The Administrative Record .............................................................. 3

    1.   Newell's Background ................................................................. 3

    2.   Relevant Medical Evidence ...................................................... 4

      a.   Treatment History—Physical Impairments ............................ 4

        i.   Steven Jacobs, M.D.—Treating Neurologist .................... 4

        ii.   George Thompson, D.C.—Treating Chiropractor ............. 5

        iii.   Mark Medici, M.D.— Orthopedic Physician ................... 5

      b.   Treatment History—Mental Impairments ............................... 6

        i.   Naeem Aftab, M.D.—Treating Psychiatrist ...................... 6

        ii.   Stephen Krieg, M.D.—Treating Psychiatrist .................... 6

        iii.   Denise Morales, LMSW—Therapist ............................... 8

        iv.   Barry Bachenheimer, CSW—Social Worker ................... 9

      c.   Opinion Evidence ...................................................................... 10

        i.   George Thompson, D.C.—Treating Chiropractor ............. 10

        ii.   Rita Figueroa, M.D.—Consultative Orthopedic Examiner ................. 11

        iii.   George Adams, M.D.—Consultative Internal ................. 12

        iv.   Naeem Aftab, M.D.—Treating Psychiatrist ................... 12

        v.   Barry Bachenheimer, CSW—Social Worker ................... 14

        vi.   Leslie Helprin, Ph.D.—Consultative Psychological Examiner ............ 14

        vii.   Leslie Fine, M.D.—Reviewing Psychiatrist .................. 15

        viii.   Z. Mata, M.D.—Reviewing Psychiatrist ...................... 15

    3.   ALJ Hearing ........................................................................... 16

II.   DISCUSSION ........................................................................................ 18

  A.   Legal Standards ............................................................................ 18

    1.   Judicial Review of Commissioner's Determinations ..................... 18

i

2. Commissioner's Determination of Disability ................................ 20

 a. Five-Step Inquiry ................................................. 21

 b. Duty to Develop the Record ........................................ 22

 c. Treating Physician's Rule ......................................... 24

 d. Claimant's Credibility ............................................ 27

B. The Court's 2017 Decision Remanding for Further Administrative
Proceedings ................................................................ 29

C. The ALJ's Decision ........................................................ 30

D. Analysis ................................................................... 38

 1. The ALJ Did Not Properly Apply the Treating Physician Rule ................. 39

 a. The ALJ Failed To Provide Good Reasons For Assigning "Little Weight"
to Dr. Aftab's Opinion ................................................ 45

 b. The ALJ's Application of the Treating Physician Rule Was Not Harmless
Error ................................................................. 49

 2. The ALJ's Step Three Finding Must Be Reconsidered in Light of the ALJ's
Error in Applying the Treating Physician Rule ........................... 50

 3. The Case Is Remanded For Further Proceedings ........................... 53

III. CONCLUSION ................................................................ 54

Eugene Newell seeks judicial review of a final determination by the Commissioner of the Social Security Administration, which denied Newell's application for disability insurance benefits and supplemental security income under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Newell's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further administrative proceedings.

## I.   BACKGROUND

### A.  Procedural Background

Newell filed for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 27, 2009.  Administrative Record ("AR"), Dkt. No. 10, at 45–46, 135–45.[1]  He alleged a disability onset date of December 31, 2007.  *Id*. at 135, 142.  The Social Security Administration ("SSA") denied Newell's claims on June 22, 2009.  *Id*. at 67–74.  Newell filed a written request for a hearing before an Administrative Law Judge ("ALJ") on August 6, 2009.  *Id*. at 79–80.  ALJ Roberto Lebron held a hearing on September 24, 2010 and subsequently issued an unfavorable decision on November 19, 2010.  *Id*. at 1–44, 47–63.  Newell sought review of the ALJ's decision by the SSA Appeals Council on December 20, 2010.  *Id*. at 130–32.  His request was denied on January 25, 2012, rendering the ALJ's decision final.  *Id*. at 64–66.  On February 17, 2012, Newell timely filed a civil action

---

[1] The page numbers refer to the sequential numbering of the certified Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing System.

in this District, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). *Id*. at 543–44. However, prior to any decision, the parties agreed to have the case remanded to the Commissioner for further administrative proceedings, and the Honorable P. Kevin Castel approved the parties' Stipulation and Order of Remand on September 12, 2012. *Id*. at 545–47.

On remand, ALJ Lebron held a hearing on July 11, 2013, but retired before issuing a decision. *Id*. at 433–71. The matter was then reassigned to ALJ Robert Gonzalez and a supplemental hearing was held on February 3, 2015. *Id*. at 472–542. On May 28, 2015, ALJ Gonzalez issued an unfavorable decision denying social security benefits, and Newell again sought judicial review of the ALJ's decision. *Id*. at 405–32. By Order dated March 31, 2017, Judge Castel adopted Magistrate Judge Debra Freeman's Report and Recommendation in substantial part, and remanded the case for further proceedings. *Id*. at 2082–2179.[2] Specifically, Judge Castel remanded the case for a determination under Listing 12.05C and for the proper application of the treating physician rule. *Id*. at 2100. Following this second remand, ALJ Gonzalez held a hearing on July 11, 2019 and issued another unfavorable decision on August 26, 2019. *Id*. at 1958–91, 2019–51.

Newell timely commenced the present action on November 22, 2019, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

---

[2] Judge Castel accepted the 2015 case (15-CV-7095 (PKC) (DF)) as related to the original 2012 case (12-CV-1237 (PKC)).

Complaint, Dkt. No. 1.[3]  The Commissioner answered Newell's complaint by filing the administrative record on March 4, 2020.  AR, Dkt. No. 10.  The parties subsequently consented to my jurisdiction on March 9, 2020.  Dkt. No. 12.  On May 4, 2020, Newell moved for judgment on the pleadings seeking reversal and remand solely for the calculation of benefits or, in the alternative, for further administrative proceedings (Dkt. No. 13), and submitted a memorandum of law in support of his motion (Dkt. No. 14, "Pl. Mem.").  The Commissioner cross-moved for judgment on the pleadings on September 4, 2020 (Dkt. No. 20) and submitted a memorandum of law in support of his cross-motion (Dkt. No. 21, "Def. Mem.").  On September 25, 2020, Newell filed his reply papers.  Dkt. No. 22 ("Pl. Reply").

## B. The Administrative Record

### 1. Newell's Background

Newell was born on December 14, 1961.  AR at 135.  He was 46 years old on his alleged onset date of disability (December 31, 2007).  *Id.*  Newell attended special education classes in high school and was granted an IEP diploma in June 1981.  *Id.* at 149–50.  Prior to the alleged disability onset date, Newell was employed as a fast-food worker, a general hardware salesperson and maintenance person, and a salesclerk.  *Id.* at 167–74.  After the alleged disability onset date, Newell performed some work as a pizza delivery driver, volunteered at a soup

---

[3]  In the notice of unfavorable decision, the ALJ observed that his decision "will become final on the 61st day following the date of this notice."  AR at 1959.  After the decision became final, Newell had 60 days to file a new civil action.  He did so within this time frame, and thus this action is timely.  In any event, the Commissioner has not raised untimeliness as a defense.

kitchen, and helped out at his landlord's bookstore; in exchange for his work, he was given free meals and housing. *Id*. at 2033–36. As of 2019, he lived in a home with friends in Orange County, *id*. at 1958, but previously lived alone for approximately a year. *Id*. at 2034–35.

Newell alleges he suffers from the following impairments: depression, anxiety, and chronic back, neck, and leg pain. *Id*. at 176, 204–05. During numerous ALJ hearings and in his submissions to the SSA, Newell described the scope of his ability to function, perform daily tasks, and travel outside of his home. *See, e.g., id*. at 1–44, 433–71, 472–542, 2019–51. On April 22, 2009, Newell completed a function report in support of his application, in which he reported that he could prepare his own meals, groom himself, clean, shop, do laundry, and pay bills. *Id*. at 155–74. Newell testified that he is able to drive, travel outside the home, walk a third of a mile, lift ten pounds, and stand for 10–15 minutes before his back and neck begin to hurt. *Id*. at 2035, 2038–40, 2041–42.

### 2.  Relevant Medical Evidence

#### a.  Treatment History—Physical Impairments

##### i.  Steven Jacobs, M.D.—Treating Neurologist

Dr. Steven Jacobs treated Newell for cervical spine issues and related neck and arm pain from November 2004 to January 2005 after a motor vehicle accident. *Id*. at 206–10. At his initial evaluation on November 22, 2004, Dr. Jacobs reported that Newell had a decreased range of motion of the neck, but there were no focal motor or sensory deficits. *Id*. at 208. After ordering an MRI of Newell's cervical spine, Dr. Jacobs found a herniated disc at C5-C6, but recommended therapy over

4

surgery.  *Id.* at 209.  Dr. Jacobs saw Newell for a follow-up visit on January 25, 2005 and noted that he was "doing well with therapy."  *Id.* at 210.

### ii.  George Thompson, D.C.—Treating Chiropractor

Dr. George Thompson intermittently treated Newell for his lower back pain from 2009 through 2019.  *Id.* at 1951–56, 2820–21.  At an initial examination on September 4, 2009, Dr. Thompson observed an altered gait resulting in a left limp, a reduced range of motion of his lumbar spine with pain, and severe lumbar and lumbo-sacral myospasm, and recommended a course of therapy.  *Id.* at 1952.  At a follow-up appointment on December 17, 2014, Dr. Thompson reported that Newell was experiencing mild, chronic lower back discomfort and neck spasms.  *Id*. at 1953.  Dr. Thompson reported in February 2019 that Newell's symptoms, which he characterized as a "dull ache," remained unchanged.  *Id*. at 2820.

### iii.  Mark Medici, M.D.— Orthopedic Physician

Dr. Mark Medici treated Newell on January 28, 2014 for his lower back pain and again on October 16, 2017 for right wrist pain.  *Id*. at 2487–93.  During the January 2014 appointment, Newell reported that his lower back pain increased with standing and walking and Dr. Medici suggested that he modify his activity and initiate physical therapy.  *Id*. at 2487–89.  Newell presented with right wrist pain at his appointment in October 2017 and reported that the pain worsened with movement and heavy lifting.  *Id*. at 2490.  MRI results reflected a tear in the ligament and cartilage in his right wrist as well as a possible sprain.  *Id*. at 2492.

### b. Treatment History—Mental Impairments

#### i. Naeem Aftab, M.D.—Treating Psychiatrist

Dr. Naeem Aftab was Newell's treating psychiatrist from 2009 to 2014 for his generalized anxiety disorder and depression and prescribed him antidepressants. *Id.* at 375–83, 895–98, 923–35. In 2010, Dr. Aftab noted in a summary letter that Newell had been taking his medications and keeping his appointments, but he was unable to work due to his condition. *Id.* at 280. Dr. Aftab's handwritten treatment notes are illegible and were never clarified despite the ALJ's numerous requests for Dr. Aftab to do so. *Id.* at 694–97, 704–05, 2357–60.

#### ii. Stephen Krieg, M.D.—Treating Psychiatrist

Dr. Stephen Krieg is Newell's current psychiatrist, who has treated Newell from December 2015 through at least April 2019. *Id.* at 2933–3067. During his first appointment in December 2015, Newell reported a history of "intermittent mild/moderate depression symptoms," "mild depressive symptoms over the past several months," "mild social anxiety symptoms," a "distant history with panic attacks," and stress related to his pizza delivery work because "sometimes he gets lost." *Id.* at 2057. Dr. Krieg noted that Newell had "mildly slow" speech, "mildly impaired" attention and concentration, and "fair hygiene." *Id.* at 3062. He diagnosed Newell with major depression, "recurrent, mild," generalized anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and morbid

6

obesity, and recommended he continue to take his current medications and meet with his psychotherapist. *Id*. at 3063.[4]

Newell met with Dr. Krieg eight times in 2016 and reported to him that his depression and anxiety had been stable and improving. *Id*. at 3015–56. He stated that he "ha[d] been enjoying life activities," sleeping well at night, and had "adequate energy throughout the day." *Id*. at 3015, 3020, 3025, 3030, 3035, 3040, 3045, 3051. Dr. Krieg continued Newell on the same medications but decreased the dosage of Remeron twice during 2016. *Id*. at 3018, 3038. Dr. Krieg reported on September 30, 2016 and November 11, 2016 that Newell had stopped working. *Id*. at 3020, 3025. However, he reported on December 16, 2016 that Newell continued to work as a pizza delivery driver for a restaurant, though he was apparently not paid, but instead received three meals for each day that he worked. *Id*. at 3015.

Over the course of six appointments in 2017, Newell's depression and anxiety symptoms continued to improve. *Id*. at 2985–3014. Dr. Krieg reported on March 27, 2017 and May 4, 2017 that Newell was not currently working at that time. *Id*. at 3000, 3005. However, Newell reported to Dr. Krieg on July 6, 2017 that he had resumed work as a volunteer two days per week at his friend's store for which his friend "supplies lunch for him whenever he works." *Id*. at 2995.

---

[4] Newell's medications include Lexapro and Remeron for anxiety and depression, Wellbutrin XL for depression, Gabapentin for increased mood stabilization and anxiety, and Abilify for increased mood stabilization and adjunctive depression treatment. *Id*. at 3063.

At a February 9, 2018 visit with Dr. Krieg, Newell reported "mildly worsening depressive symptoms" and stated that he sometimes "feel[s] more lonely." *Id*. at 2979. During this visit, Newell also noted that he was volunteering twice per month. *Id*. at 2979. On March 27, 2018, Dr. Krieg observed "worsening depressive symptoms," "decreased energy/motivation," "emotional eating behaviors," and anhedonia, and modified Newell's original diagnosis to state: "Depression, major, recurrent, moderate." *Id*. at 2974, 2976. By June 2018, however, Newell reported he was "doing well" and denied any symptoms of depression, and Dr. Krieg adjusted his diagnosis back to "[d]epression, major, recurrent, mild." *Id*. at 2967, 2970. Newell reported that his medications, which included Lexapro, Wellbutrin, Abilify, Remeron, and Gabapentin, had been beneficial in managing his anxiety and depression symptoms as well as his insomnia. *Id*. at 2967. Newell's symptoms improved with continued use of medication at his following three appointments in 2018. *Id*. at 2947–66.

Newell met with Dr. Krieg on February 15 and April 1, 2019 and reported having recent mild generalized anxiety symptoms, mild benefits in decreasing his "breakthrough" anxiety symptoms from his hydroxyzine PRN medication, and that his depressive symptoms had been "well-controlled." *Id*. at 2933, 2940. Additionally, Newell reported to Dr. Krieg on April 1, 2019 that he continued to volunteer at a food pantry twice per month. *Id*. at 2933.

### iii.  Denise Morales, LMSW—Therapist

Denise Morales, a Licensed Master Social Worker ("LMSW"), provided Newell with behavioral health counseling on two occasions in August 2009 at The Greater

Hudson Valley Family Health Center Inc.  *Id.* at 281–93.  During the first visit on August 20, 2009, Newell reported that he often had panic attacks and worried about getting medication for his "nerves."  *Id.* at 282.  He also described feelings of depression and reported that he was not working at the time, living in a group residence, and had "friends he associate[d] with."  *Id.*  Morales noted that his reported symptoms were consistent with a diagnosis of depressive disorder and anxiety disorder.  *Id.*

During the second visit on August 29, 2009, Morales provided supportive counseling to address the root causes of his anxiety and noted that Newell "had difficulty understanding the connection between negative thinking, worrying and anxiety" and "often bec[ame] anxious as he is constantly thinking about what he will be doing in the future."  *Id.* at 281.

### iv. Barry Bachenheimer, CSW—Social Worker

Barry Bachenheimer, a social worker at New Visions Psychotherapy and Counseling Service, treated Newell for his depression on a weekly basis from September 2009 to September 2010, July 2013 to November 2014, and January 2017 to March 2019.  *Id.* at 358–70, 1136–49, 2524–34.

Newell presented with depression and depressive symptoms to Bachenheimer in September 2009 after Newell's mother passed away.  *Id.* at 358–59.  From September 2009 to September 2010, Bachenheimer noted that both he and Newell thought that the medications seemed to be helping Newell manage his depression and anxiety symptoms.  *Id.* at 363–64, 366–67.  Bachenheimer reported to the SSA on April 30, 2010 that Newell had difficulty returning to work and that he "d[id] not

9

feel he c[ould] return." *Id*. at 358.  Newell also subsequently conveyed to

Bachenheimer in September 2010 that he felt he could not work because he was

depressed over his mother's death.  *Id*. at 370.

In most sessions during the period from 2009 to 2018, Bachenheimer

observed that Newell seemed to be doing better with each appointment and that he

was managing his symptoms and treating his depression well, although he still

occasionally suffered from depressive episodes. *See, e.g., id*. at 363, 365, 1138, 1141,

2529, 2532.  In 2013, Bachenheimer noted twice that Newell had poor hygiene and

only washed his clothes once a month.  *Id*. at 1138–39.  From 2017 to 2018,

Bachenheimer observed that Newell's anxiety and depressive symptoms had

"definitely diminished."  *Id*. at 2532.  According to Bachenheimer's notes on

November 19, 2018, Newell worked at the religious store his landlord owned and

disclosed that "he ha[d]n't put in as many hours as [his landlord] would like." Id. at

2531.  Newell and Bachenheimer discussed Newell's inability to "follow-through"

during this session and he agreed to work on this issue.  *Id*.  Bachenheimer also

noted that while working at the religious bookstore, Newell did not fully understand

how to operate an "iPad which ha[d] some kind of financial tool attached to it."  *Id*.

at 2532.

### c.  Opinion Evidence

#### i.  George Thompson, D.C.—Treating Chiropractor

On August 7, 2009, Dr. Thompson completed a medical source statement of

Newell's ability to do physical work-related activities.  *Id*. at 254–59.  In that

statement, Dr. Thompson reported that Newell could lift and carry up to 10 pounds frequently and 20 pounds occasionally, but never more than 20 pounds, and could sit, stand, or walk for one hour without interruption and for a total of one hour during an eight-hour workday. *Id*. at 254–55. Additionally, Dr. Thompson opined that Newell could occasionally reach, handle, finger, feel, push, pull, operate foot controls, crouch, crawl, kneel, stoop, climb stairs and ramps, and could tolerate exposure to humidity and wetness, extreme heat and cold, and vibrations. *Id*. at 256–58. Dr. Thompson also noted in the medical source statement that Newell could never climb ladders or scaffolds, balance, or move mechanical parts and that he could not travel without a companion for assistance or use standard public transportation. *Id*. at 257–59. With respect to daily activities, Dr. Thompson found Newell could perform activities like shopping, prepare and feed himself, and care for his personal hygiene. *Id*. at 259.

### ii. Rita Figueroa, M.D.—Consultative Orthopedic Examiner

On January 19, 2015, Dr. Rita Figueroa, a consultative orthopedic examiner, conducted an orthopedic examination of Newell. *Id*. at 1173–82. Dr. Figueroa diagnosed Newell with bilateral knee arthritis, chronic lower back pain, and bilateral carpal tunnel syndrome. *Id*. at 1175. Dr. Figueroa also opined that Newell had a "moderate limitation for activities requiring repetitive kneeling and squatting due to arthritis in the knees," but "no limitations for repetitive bending, lifting, carrying, walking or standing" based on her evaluation. *Id*.

11

On that same day, Dr. Figueroa completed a medical source statement and reported that Newell was able to frequently lift up to, but never more than, 50 pounds; carry up to 20 pounds occasionally and 21 to 50 pounds frequently; stand and walk for two hours total in an eight-hour workday, and sit for four hours total in an eight-hour workday. *Id.* at 1176–77. Dr. Figueroa also noted that Newell did not require the use of a cane to ambulate and that he was able to tolerate occasional exposure to unprotected heights and moving mechanical parts as well as frequent exposure to dust, odors, fumes, and pulmonary irritants. *Id.* at 1177–80.

### iii. George Adams, M.D.—Consultative Internal Medicine Examiner

Dr. George Adams conducted an internal medicine examination on May 21, 2009. *Id.* at 226–31. Dr. Adams found that Newell could "walk on heels and toes without difficulty," had a normal stance, and was "able to rise from a chair without difficulty." *Id.* at 227. He also noted that Newell could cook, clean, do laundry, shop, shower, and dress himself. *Id.* at 227. Newell had full range of motion of his shoulders, elbows, forearms, wrists, hips, knees, ankles with full strength in his upper and lower extremities. *Id.* at 228. Dr. Adams diagnosed Newell with general depression and adjustment disorder, mild mental retardation, degenerative joint disease in both knees, and bilateral carpal tunnel syndrome, and opined that he had "no physical limitation." *Id.* at 229.

### iv. Naeem Aftab, M.D.—Treating Psychiatrist

In a letter dated April 20, 2010, Dr. Aftab stated that Newell was "unable to work due to his psychiatric condition." *Id.* at 280. Dr. Aftab also submitted a

12

medical source statement dated September 23, 2010, in which he reported that Newell's impairment did not affect his ability to understand, remember, or carry out instructions. *Id*. at 371. He also noted that Newell had "marked" limitations in his ability to interact appropriately with supervisors, co-workers, and the public as well as respond to changes in a routine work setting. *Id*. at 372.

Dr. Aftab also completed a Mental Residual Functional Capacity Statement dated July 31, 2013. *Id*. at 895–98. Dr. Aftab found that Newell was unable to understand, remember, and carry out detailed instructions, travel in unfamiliar places, or use public transportation for 10% of an eight-hour workday; nor could he maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, work in coordination with others without being distracted by them, respond appropriately to changes in the work setting, set realistic goals, get along with coworkers or peers, accept instructions and respond appropriately to criticism from supervisors, or complete a normal workday or workweek without interruptions from psychologically-based symptoms for 5% of an eight-hour workday. *Id*. at 895–98. Dr. Aftab opined that Newell would be "off task" for 15% of an eight-hour workday, absent more than six days per month on average, and unable to complete an eight-hour workday more than six days per month on average. *Id*. at 897. Dr. Aftab reported that Newell would not be able to obtain and retain work in a competitive work environment due to his impairments. *Id*. at 898.

##### v.  Barry Bachenheimer, CSW—Social Worker

By letter dated April 30, 2010, Bachenheimer reported that Newell "has had difficulty returning to work" and Newell disclosed that he "does not feel he can return" but "is hopeful that if he goes on disability, he can become more independent once again." AR at 358.

##### vi. Leslie Helprin, Ph.D.—Consultative Psychological Examiner

On May 21, 2009, Dr. Leslie Helprin, a licensed psychologist, conducted an evaluation of Newell. *Id*. at 222–25. Dr. Helprin noted that Newell was cooperative; his social skills, appearance, and speech were adequate; and his thought processes, attention, and concentration were coherent and intact. *Id*. at 223. Dr. Helprin opined that Newell had no limitations in his ability to understand and follow simple instructions and directions, perform rote tasks and some complex tasks independently, relate adequately with others, maintain attention and concentration, maintain a regular schedule, make appropriate simple decisions, or deal appropriately with stress. *Id*. at 224. Dr. Helprin recommended that Newell undergo medical and orthopedic evaluation to determine if his medical conditions preclude him from all work. *Id.* at 225.

Dr. Helprin also conducted a second evaluation as well as an intelligence evaluation on January 19, 2015. *Id*. at 1123–34. In her evaluation, Dr. Helprin opined that Newell had no limitations in his ability to maintain a regular schedule, make appropriate, simple decisions, relate adequately with others, and deal appropriately with stress. *Id*. at 1125. However, Dr. Helprin found moderate

14

limitations in his ability to understand and follow simple instructions, complete simple and complex tasks independently, and learn new, simple tasks; and marked limitations in his ability to maintain attention and concentration due to cognitive limitations. *Id.* Again, Dr. Helprin recommended that Newell undergo medical evaluation to determine if his impairments preclude him from all work. *Id.* at 1126.

Based on her intelligence evaluation, Dr. Helprin reported that Newell had a Full Scale IQ of 63 and was "functioning cognitively overall in the deficient range." *Id.* at 1129. Her opinion as to Newell's functional limitations remained the same as her mental status evaluation. *Id.* at 1129–30.

### vii.  Leslie Fine, M.D.—Reviewing Psychiatrist

Dr. Leslie Fine testified as a reviewing psychiatrist at the September 24, 2010 hearing that Newell "could do simple and repetitive work." *Id.* at 31. Additionally, Dr. Fine opined that Newell had mild limitations in his daily living activities, and moderate limitations in socialization, concentration, persistence, and pace. *Id.* at 31–32.

### viii.  Z. Mata, M.D.—Reviewing Psychiatrist

On June 3, 2009, Dr. Z. Mata submitted a mental residual functional capacity assessment based on her review of Newell's medical evidence and treatment records. *Id.* at 246–49. Dr. Mata reported that Newell had no significant limitations in the categories of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation" except that he had moderate limitations in his ability to understand, remember, and carry out

15

detailed instructions and set realistic goals or make plans independently of others. *Id*. at 246–47.  Dr. Mata also opined that Newell "would be capable of following and understanding simple rote tasks and complex tasks . . . [and] performing at least simple work." *Id*. at 248.

### 3. ALJ Hearing

Represented by counsel, Newell testified in-person in White Plains, New York before ALJ Gonzalez on July 11, 2019.  AR at 2019–51.  Testimony was also taken from Vocational Expert ("VE") Ray Burger.  *Id*.[5]

Newell testified to the jobs he held prior to his disability onset date of December 31, 2007, which included positions as a general hardware salesperson and maintenance person, a salesclerk/cashier, and a fast-food worker.  *Id*. at 2026–32.  After his disability onset date, Newell helped out at a pizza place (as a delivery driver), his landlord's religious bookstore, and a soup kitchen.  *Id*. at 2033–36. Newell stated that he was paid with free meals while working as a delivery driver, *id*. at 2033, and he received free rent in exchange for his work at his landlord's religious bookstore, *id*. at 2035–36.  Newell also testified that he "messed up on the register most of the time" while working at the bookstore and did not understand how to work the credit card function on the cash register.  *Id*. at 2034, 2040–41.

Newell testified that he was living with friends at the time of his hearing.  *Id*. at 2034.  Prior to that living arrangement, he lived alone in an apartment above his

---

[5] While the hearing transcript refers to the vocational expert as "Berger," *id*. at 2019, the correct spelling of his name, according to his résumé, is Burger.  AR at 2363.

landlord's bookstore for about a year.  *Id.* at 2034–36.  Newell also testified that he had a car, was able to drive, received a pension from his prior job at Bradley's ($109/month), and received food stamps.  *Id.* at 2035.

Newell also answered questions regarding his recent knee replacement surgeries and his current physical limitations.  *Id.* at 2036–43.  Newell stated that he underwent two knee replacement surgeries due to arthritis in both knees (his left knee was operated on September 1, 2017 and his right knee was operated on April 13, 2018).  *Id.* at 2036.  He stated that he believed his weight (around 350 pounds) impacted his ability to get around, move, get up and down, sit, walk, lift, and carry because his weight causes him back pain.  *Id.* at 2037.  Newell testified that he could likely lift and carry up to 10 pounds and stand for 10 to 15 minutes before his back and neck start to hurt, but could not walk a city block without stopping due to his back pain and breathlessness.  *Id.* at 2039, 2041–43.

VE Burger testified next.  Burger opined that a hypothetical person with Newell's age, education, and work history could engage in a full range of light exertional work, understand, remember, and carry out simple work, adapt to routine workplace changes, occasionally climb stairs, crouch, stoop, and kneel, but must avoid exposure to dust, fumes, and noxious gases, and could not work at unprotected heights or climb ladders, ropes and scaffolds, and would be able to perform work as a fast-food worker and a cashier.  *Id.* at 2045–46.  Further, Burger testified that a person with the ability to engage in a full range of sedentary exertional work along with the same above-listed limitations could not perform any

17

of Newell's past work, but could work as a food order clerk, a document clerk, or an inspector. *Id.* at 2047. When questioned by Newell's counsel, Burger stated that a person with difficulty understanding instructions as well as attention and concentration limitations could not perform any of the above-listed jobs. *Id.* at 2048. Additionally, Burger testified that a person unable to operate a cash register would not be able to perform jobs as a cashier or fast-food worker, but that would not preclude that person from all employment opportunities. *Id.* at 2048–50.

## II.   DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more

complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted).  The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

20

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R.

§ 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a

claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[6]  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone

---

[6] The 2017 revisions to the applicable regulations included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017). Accordingly, this opinion applies the regulations that were in effect when Newell's claims were filed with the added clarifications provided in the 2017 revisions.

or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2);

416.927(d)(2).

A treating physician's opinion is not always controlling. For example, a legal

conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling,"

because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No.

09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.

1999) ("A treating physician's statement that the claimant is disabled cannot itself

be determinative."). Additionally, where "the treating physician issued opinions

that [were] not consistent with other substantial evidence in the record, such as the

opinion of other medical experts, the treating physician's opinion is not afforded

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran

v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted)

(alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the

treating physician's] opinion is with the record as a whole, the less weight it will be

given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the

Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420

(quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate). As a result, "the 'treating physician rule' is

25

inextricably linked to a broader duty to develop the record.  Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at \*13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider the so-called "*Burgess* factors" outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess,* 537 F.3d at 129; 20 C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must decide whether the opinion is entitled to controlling weight."  *Estrella*, 925 F.3d at 95.  Second, if, based on these considerations, the ALJ declines to give controlling weight to the treating physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons for the weight" ultimately assigned to the treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints."  *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–

61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7.

> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

### B. The Court's 2017 Decision Remanding for Further Administrative Proceedings

By Order dated March 31, 2017, Judge Castel remanded this case for further administrative proceedings that have now given rise to the ALJ decision at issue here. In his Order, Judge Castel concluded that the ALJ's finding that Newell's 2015 IQ evaluation was invalid—and, therefore, he did not satisfy the criteria under Listing 12.05C—was not supported by substantial evidence. *Newell v. Colvin*, No. 15-CV-7095 (PKC) (DF), 2017 WL 1200911, at *5 (S.D.N.Y. Mar. 31, 2017). However, because the ALJ did not conduct an independent evaluation of the other requirements under Listing 12.05C, the Court could not "evaluate whether his decision as to the application of Listing 12.05C was supported by substantial evidence." *Id*.

Judge Castel also concluded that substantial evidence supported the ALJ's decision not to afford controlling weight to Dr. Aftab's April 20, 2010 and September 23, 2010 opinions, but that the ALJ failed to properly consider Dr. Aftab's 2013 opinion for three reasons: (1) the ALJ accorded more weight to the opinion of Dr. Fine than to Dr. Aftab even though Dr. Fine did not examine Newell or review his psychiatric records first-hand; (2) the ALJ failed to identify which portions of Dr. Aftab's 2013 statement conflicted with other mental health providers' opinions; and

29

(3) the ALJ failed to explain why Newell's daily activities are inconsistent with Dr. Aftab's conclusions that Newell can "understand, remember and carry out simple instructions and '[m]ake simple work-related decisions,' but has difficulty with detailed instructions, and '[m]aintain[ing] attention and concentration for extended periods of time.'" *Id.* at *8.  Finally, Judge Castel found that the ALJ's adverse credibility determination of Newell was supported by substantial evidence.  *Newell,* 2017 WL 1200911, at *9; AR at 2099.  Accordingly, Judge Castel instructed the ALJ on remand to determine whether Newell's condition meets the other requirements of Listing 12.05C and to properly apply the treating physician rule as to Dr. Aftab's 2013 opinion on remand.  *Id.* at *9.

### C. The ALJ's Decision

Following Judge Castel's Remand Order, the ALJ issued another decision dated August 26, 2019, concluding that Newell was not disabled as defined by the Social Security Act.  AR at 1958–82.  Following the five-step inquiry, at step one the ALJ found that Newell has not been engaged in substantial gainful activity since December 31, 2007, the alleged onset date of Newell's impairments.  *Id*. at 1965.  At step two, the ALJ found that Newell had severe impairments of depressive disorder, anxiety disorder, intellectual disability, bilateral chondromalacia and degenerative joint disease of the knees, status post bilateral knee replacements, degenerative disc disease of the lumbar spine with lumbar spine radiculopathy, degenerative disc disease of the cervical spine, left meralgia paresthetica, asthma, sleep apnea, chronic kidney disease, and morbid obesity.  *Id*. at 1965, 1967.  The ALJ found the

following conditions to be non-severe: right wrist derangement, right hand pain, carpal tunnel syndrome, generalized joint pain, headaches, hypertension, hyperlipidemia, edema, syncope, diarrhea, abdominal pain, gastroesophageal reflux disease ("GERD"), benign prostatic hyperplasia, urinary frequency, dyspnea, history of COPD, otalgia, sinusitis, dermatitis, cellulitis, shingles, herpes zoster, cataracts, insomnia, sleep disturbance, fatigue, and vitamin deficiencies. *Id.* at 1967. The ALJ noted that the non-severe conditions "do not impose more than minimal limitations in the claimant's ability to engage in basic work activities." *Id.* In reaching this conclusion, the ALJ considered the observations of Newell's consultative examiners, who concluded that Newell had "intact hand and finger dexterity," normal echocardiograms, and a good response to cataract surgery, and was able "to prepare simple meals and sort, handle, and use paper files." *Id.*

At step three, the ALJ found that Newell does not have an impairment or combination of impairments that meets or medically equals the severity of Listing 1.02A, 1.04, 3.02, 3.03, 12.04, 12.05, 12.06, or 12.11. *Id.* at 1966–72. The ALJ determined that Listing 1.02A was not met due to the evidence that Newell was "capable of sustaining a reasonable walking pace over a sufficient distance because he [was] able to carry out his activities of daily living." *Id.* at 1968. Additionally, the ALJ found that Listing 1.04 was not met because there was "no evidence of nerve root compression with sensory and reflex loss along with positive straight-leg raising tests" or "evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in an inability to ambulate effectively." *Id.* The ALJ further determined

that Listings 3.02 and 3.03 were not met because Newell's laboratory results and clinical evaluations "indicate pulmonary functioning at levels above those required by the listings" and there was no evidence of exacerbations or complications as required by the listings. *Id.*

The ALJ found that Newell's mental impairments do not meet or medically equal the criteria of Listings 12.04, 12.05, 12.06, or 12.11. *Id.* at 1966. Specifically, the ALJ found that Newell's impairments did not satisfy the paragraph B criteria in those listings (as set out in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)) as he only had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting and managing oneself. *Id.* at 1966, 1969–70. The ALJ also determined that Newell did not satisfy the paragraph C criteria because the evidence did not establish that Newell would have only marginal adjustment. *Id.* at 1970–71. The ALJ specifically analyzed Newell's impairments under an old version of Listing 12.05C as directed by Judge Castel, and determined that Newell did not suffer qualifying deficits in adaptive functioning. *Id.* at 1972.

Prior to evaluating step four, the ALJ determined Newell's Residual Functional Capacity ("RFC") as follows: Newell could "perform light work," "understand, remember, and carry out simple work and adapt to routine workplace changes," "lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, sit for six hours in an

eight-hour workday[, and] . . . occasionally crouch, stoop, kneel, climb ramps and stairs," but could not "climb ladders, ropes, [or] scaffolds" and must avoid "unprotected heights as well as concentrated exposure to dust, fumes, and noxious gases." *Id.* at 1972. In formulating this RFC, the ALJ evaluated Newell's allegations and testimony and determined that Newell's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully consistent with the medical evidence and other evidence in the record." *Id.* at 1973. The ALJ provided several reasons for this finding, including that since the alleged disability onset date, Newell's "chronic pain and symptoms have generally responded well to conservative treatment modalities, including medication management, activity and dietary modification, home exercises, physical therapy, chiropractic care, injections, the use of braces, inhalers, and [sic] CPAP machine, and specialist treatment with orthopedists, pulmonologists, and nephrologists." *Id.* Additionally, the ALJ concluded that treatment notes demonstrated that Newell's mental impairments "have generally responded well to outpatient counseling and psychotropic medication management." *Id.* at 1974. Moreover, the ALJ observed that Newell's testimony suggested that his daily activities were not limited to the extent one would expect given his alleged symptoms and limitations. *Id.*

The ALJ also summarized Newell's treatment history and weighed the opinions of medical sources to reach his RFC finding. *Id.* at 1974–80. The ALJ

afforded "significant weight" to the opinions of consultative examiner Dr. Adams, which noted that Newell had "no physical limitations," due to his "expertise, his physical examination of [Newell], and the relative consistency of his opinions with the overall medical evidence." *Id*. at 1976–77.   However, the ALJ considered Dr. Adams' opinions in balance with the overall evidence, including subsequent records submitted that were "more consistent with increased limitations with the passage of time, including issues with the knee, neck, and back." *Id*. at 1977.

The ALJ assigned "significant weight" to Dr. Helprin's May 2009 opinion that Newell had "no limitations in the ability to understand and follow simple instructions and direction and perform rote tasks," "relate adequately with others, maintain attention and concentration, maintain a regular schedule, make appropriate simple decisions, and deal appropriately with stress," but did have "limitations in his ability to perform some complex tasks independently." *Id*. at 1976–77.   In support of this weight assignment, the ALJ noted Dr. Helprin's "expertise, her mental status examination of [Newell], and the relative consistency of her opinions with the overall medical evidence, including mental status examination clinical findings." *Id*. at 1977.   Additionally, the ALJ afforded "some weight" to Dr. Helprin's January 2015 opinion that Newell had "moderate limitations in the ability to understand and follow simple instructions, complete simple and complex tasks independently, and learn new, simple tasks," but gave "very little" weight to Dr. Helprin's finding that Newell had "marked limitations in the ability to maintain attention and concentration due to cognitive difficulties"

34

because it was "inconsistent with the evidence including her earlier opinions from May 2009" and Dr. Krieg's mental status exams, which did not establish any marked or extreme limitations. *Id*. at 1979.

The ALJ assigned "significant weight" to Dr. Mata's June 2009 opinions that Newell had no significant limitations in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, interact appropriately with the general public, and maintain attention and concentration for extended periods; and moderate limitations in his ability to understand, remember, and carry out detailed instructions, and "set realistic goals or make plans independently of others." *Id*. at 1976, 1978. The ALJ noted his "expertise, his review of the [Newell's] medical records, and the relative consistency of his opinions with the overall evidence" as the basis for this weight determination. *Id*. at 1978. However, the ALJ accorded "very little weight" to the portion of Dr. Mata's opinions that described Newell having "moderate difficulties in maintaining social functioning" because Dr. Mata "did not identify any notable socialization difficulties" in his RFC assessment and it was not consistent with the medical evidence in the record or Newell's work history after the alleged onset date. *Id*.

The ALJ gave "significant weight" to Dr. Fine's testimony at the September 2010 hearing that Newell was "able to do simple work" because "it [was] generally consistent with the overall evidence in the record," including the treatment notes from Bachenheimer and Dr. Krieg as well as Dr. Mata's consultative opinions. *Id*. 1976, 1978.

35

The ALJ assigned "little weight" to Dr. Figueroa's January 2015 opinion that Newell could "lift up to fifty pounds frequently and carry up to fifty pounds occasionally, stand for two hours total in an eight-hour workday, walk for two hours total in an eight-hour workday, and sit for four hours total in an eight-hour workday." *Id*. at 1976–78. In assigning little weight, the ALJ reasoned that her opinion was "somewhat inconsistent with the balance of the evidence in the record, including the [Newell's] activities of daily living and Dr. Figueroa's own opinions in the same report." *Id*. at 1978.

The ALJ also afforded "little weight" to Dr. Thompson's August 2009 opinion that Newell could lift and carry up to 20 pounds occasionally, sit, stand, or walk for one hour without interruption or one hour in an eight-hour workday, "occasionally reach, handle, finger, feel, push, pull, operate foot controls, crouch, crawl, and tolerate exposure to humidity and wetness, extreme heat and cold, and vibrations," but could "never balance or be around moving mechanical parts." *Id*. at 254–59, 1979. The ALJ reasoned that such extreme limitations were inconsistent with his own subsequent opinions in the same report, the opinions of Drs. Adams and Figueroa, and Newell's reported activities of daily living. *Id*. at 1979.

The ALJ assigned "little weight" to all three of the opinions of treating psychiatrist, Dr. Aftab, which included his April 2010 opinion that Newell was "unable to work due to his psychiatric conditions"; his September 2010 opinion that Newell "ha[d] no limitations in the ability to understand, remember, and carry out simple and complex instructions and make judgments on simple and complex work-

related decisions" but "'marked' limitations in the ability to interact appropriately with co-workers, supervisors, and the public and respond appropriately to usual work situations and to changes in a routine work setting"; and his July 2013 opinion that Newell was "not precluded for 15% or more of an eight-hour workday for any specific mental function . . . [but was] precluded for 10% of an eight-hour workday in the ability to understand, remember, and carry out detailed instructions . . . and travel in unfamiliar places and use public transportation." *Id*. at 1979–80. The ALJ found Dr. Aftab's 2010 opinion regarding Newell's "marked limitations" inconsistent with the record, including "ongoing work activity as well as appropriate interactions with medical personnel during examinations," the opinions of Drs. Fine, Mata, and Helprin, and the mental status evaluations by Dr. Krieg. *Id*.  The ALJ opined that Dr. Aftab's 2013 opinion was not supported by "consistent mental status examination clinical findings" or any "adequate explanation or cited clinical findings to support such significant limitations." *Id.*[7]

The ALJ gave "very little weight" to the April 2010 letter from social worker Bachenheimer, which stated that Newell "had difficulty returning to work," did not "feel he c[ould] return" and was "hopeful that if he [went] on disability, he c[ould] become more independent once again." *Id*. at 1980 (citing *id*. at 358).  The ALJ found that this statement "appear[ed] to be attributed to the claimant's self-

---

[7] As noted in his decision, the ALJ requested clarification from Dr. Aftab of his inconsistent mental examination findings and illegible treatment notes through letters and phone calls on December 2014, June 2018, July 2018, October 2018, and December 2018, but received no response.  AR at 1980.

reporting, and [was] not supported by any adequate explanation, cited clinical findings, or any specific or appropriate function-by-function assessments of [Newell's] work-related abilities." *Id*. at 1980.

The ALJ gave "very little weight" to the assessments of Jessica Ferraiolo, P.A., and Rocco Bassora, M.D. from 2015 to 2016, which stated that Newell remained disabled (*id*. at 3068–3181), as the assessments were vague and "d[id] not provide any specific function-by-function assessments of [Newell's] work-related abilities." *Id*. at 1980. Finally, the ALJ assigned "no weight" to the August 2014 VE interrogatory because the report "ha[d] been superseded by the valid and well-supported testimony" of VE Burger, who testified in person at the July 11, 2019 hearing. *Id*. 1980–81.

At step four, the ALJ found that Newell's past relevant work as a fast-food worker and cashier, but not as a janitor, did not exceed his RFC and therefore he was capable of performing that work. *Id*. at 1981. Accordingly, the ALJ concluded that Newell was not disabled from December 31, 2007 through the date of his decision. *Id*.

### D. Analysis

Newell contends that the ALJ decision should be reversed and remanded solely for the calculation of benefits, or, in the alternative, for further administrative proceedings for two reasons: (1) the ALJ violated the treating physician rule, and (2) the ALJ improperly concluded that his impairments did not meet the Listing 12.05C requirement. Pl. Mem. at 13–22. The Commissioner

38

counters that the ALJ correctly applied the treating physician rule, properly found that Newell did not meet or equal the criteria of any mental impairment listing, and his RFC finding is supported by substantial evidence.  Def. Mem. at 16–24.

### 1. The ALJ Did Not Properly Apply the Treating Physician Rule

Newell argues that the ALJ improperly applied the treating physician rule by failing to provide "specificity" when affording "little weight" to the opinion of his treating psychiatrist, Dr. Aftab.  Pl. Mem. at 20–22.  Specifically, Newell contends that the ALJ failed to identify which portions of Dr. Aftab's 2013 report conflicted with other consultative medical opinions or explain why he considered Newell's daily activities inconsistent with Dr. Aftab's conclusions.  *Id*.  Newell also claims that Dr. Aftab's statements in the 2013 report are consistent with the record, including Newell's own testimony and Dr. Helprin's 2009 and 2015 opinions.  *Id*. at 21.

In response, the Commissioner contends that the ALJ provided the requisite "good reasons" for assigning little weight to Dr. Aftab.  Def. Mem. at 23–24.  Specifically, the Commissioner argues that the ALJ properly discounted Dr. Aftab's opinion because (1) his treatment notes lacked mental status examination findings; (2) his September 2010 medical source statement was inconsistent with treatment notes from Dr. Krieg, the consultative opinions of Drs. Helprin, Fine, and Mata, and Newell's daily work and activities; and (3) his 2013 medical source statement was "unclear" and contradicted by Newell's work-related activities.  *Id*. at 23.

It is undisputed that Dr. Aftab, who treated Newell from 2009 to 2014 on a monthly basis for his psychiatric conditions, is Newell's treating physician.  AR at 375–83, 895, 923–35.  In deciding to give less than controlling weight to Dr. Aftab's opinions, the ALJ was therefore required to explicitly consider the *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129.  While the Second Circuit "does not require 'slavish recitation of each and every factor,' the ALJ's 'reasoning and adherence to the regulation' still must be clear from his opinion." *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3686760, at *3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F. App'x. 67, 70 (2d Cir. 2013)).  If the ALJ does not "explicitly" consider these factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Estrella*, 925 F.3d at 95.  Here, in giving Dr. Aftab's opinions less-than-controlling weight, the ALJ failed to weigh the following three *Burgess* factors in his analysis: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of Dr. Aftab's opinion; and (3) whether the opinion is from a specialist.

First, the ALJ did not explicitly consider Dr. Aftab's extensive length and frequency of treatment with Newell, as required.  *See, e.g., Ramos v. Comm'r of Soc.*

*Sec,* No. 13-CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015)
(remanding case in part because ALJ did not consider length of treating physician's
treatment).  Dr. Aftab was Newell's treating psychiatrist from 2009 to 2014, met
with Newell on approximately a monthly basis, and provided five years of medical
records and treatment notes as well as two medical source statements to the SSA.
Pl. Mem. at 20; AR at 375–83, 895, 923–35.  Dr. Aftab diagnosed and treated Newell
for his generalized anxiety disorder and depression, prescribed him
antidepressants, and managed his medication on a monthly basis.  AR at 375–83,
895, 923–35.  When evaluating mental impairments such as those at issue here, the
length of a psychiatrist's treatment relationship with his or her patient is of
particular importance because mental disabilities are best diagnosed and observed
over time.  *See Rodriguez v. Astrue,* No. 07-CV-534 (WHP) (MHD), 2009 WL 637154,
at *26 (S.D.N.Y. Mar. 9, 2009) ("The mandate of the treating physician rule to give
greater weight to the opinions of doctors who have a relationship with a plaintiff is
particularly important in the mental-health context."); *Santiago v. Barnhart*, 441 F.
Supp. 2d 620, 629 (S.D.N.Y. 2006) ("The rule is even more relevant in the context of
mental disabilities, which by their nature are best diagnosed over time.").  The
ALJ's failure to explicitly consider Dr. Aftab's sustained observations of Newell's
condition and his relative improvement or regression over five years of treatment, is
exacerbated by the fact that he relies instead on the opinions of one-time
consultative examiners and reviewing psychiatrists to undermine Dr. Aftab's

findings.[8]  *See* AR at 1980; *Estrella*, 925 F.3d at 98 (opinion of a one-time

consultative examiner did not serve as a "good reason" for minimizing the opinion of

the treating source); *Santiago*, 441 F. Supp. 2d at 629 ("The Treating Physician

Rule recognizes that a physician who has a long history with a patient is better

positioned to evaluate the patient's disability than a doctor who observes the

patient once for the purposes of a disability hearing.").

Second, the ALJ did not explicitly consider the evidence in support of Dr.

Aftab's 2013 opinion.  In that opinion, Dr. Aftab found that Newell was precluded

for 5% of an eight-hour workday in his ability to maintain attention and

concentration for extended periods of time.  *Id.* at 896.  Consistent with this finding,

Dr. Helprin also found limitations in this functional category, assessing "marked"

limitations in Newell's ability to maintain attention and concentration.  *Id.* at

1125.[9]  Moreover, Drs. Aftab and Helprin both opined that Newell had some

limitation in his ability to understand, remember, and carry out instructions.  *Id.* at

---

[8] Notably, although not explicitly referred to in Judge Castel's March 31, 2017 opinion remanding this case for further administrative proceedings, Magistrate Judge Freeman's underlying Report and Recommendation specifically highlighted the ALJ's error in omitting discussion of this *Burgess* factor when she concluded that the treating physician rule had been violated.  *Newell*, 2017 WL 9538171, at *33.

[9]  The ALJ assigned "very little weight" to this portion of Dr. Helprin's 2015 assessment.  AR at 1978–79.  The ALJ reasoned that this portion of Dr. Helprin's assessment is inconsistent with the evidence, including her May 2009 opinion and subsequent opinions, which found only moderate restrictions, as well as with Dr. Krieg's mental status exams, which did not document any marked or extreme limitations.  *Id.*  The ALJ failed to consider the consistency of Dr. Helprin's opinion with that of Dr. Aftab's 2013 opinion before according "very little weight" to this specific portion of Dr. Helprin's 2015 opinion.

896 (impairments preclude ability to understand, remember, and carry out short detailed instructions for 15% of an eight-hour workday); *id.* at 1125 (moderate limitations in ability to follow and understand simple directions and instructions due to cognitive limitations).  Finally, both Drs. Aftab and Helprin concluded that Newell had no limitations in making simple decisions or relating and interacting appropriately with others.  *Id.* at 896 (impairments do not preclude ability to make simple work-related decisions and interact appropriately with the general public); *id.* at 1125 (no limitations in his ability to make appropriate simple decisions, nor to relate adequately with others).  In making his weight determination, the ALJ should have acknowledged that Dr. Helprin's opinion corroborates Dr. Aftab's 2013 findings, but instead he omitted any discussion of these consistent findings. *See, e.g., Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 430-31 (S.D.N.Y. 2010) (requiring remand as ALJ failed to comply with treating physician rule by failing to address evidence in support of treating doctors' opinions).

Nor did the ALJ consider Newell's own statements about his work-related activities, which also corroborated Dr. Aftab's findings that Newell was precluded from 10% of an eight-hour workday in his ability to (1) understand, remember, and carry out detailed instructions, and (2) travel in unfamiliar places or use public transportation. *See, e.g., id.* at 2034, 2040–41 (Newell testifying he "messed up on the register most of the time" and did not understand how to work the credit card function on the cash register); *id.* at 2532 (Newell reporting to Bachenheimer that he does not understand how to operate the "iPad which has some kind of financial

43

tool attached to it"); *id.* at 2057 (Newell reporting to Dr. Krieg that he suffers from stress related to his pizza delivery job because "sometimes he gets lost").  While the ALJ may have found Newell not entirely credible, he should have acknowledged this consistent testimony when determining what weight to afford to Dr. Aftab's 2013 opinion.  In sum, the ALJ failed to consider this *Burgess* factor by omitting any reference to the evidence in the record supporting Dr. Aftab's 2013 opinion.

Third, the ALJ also erred by not explicitly acknowledging Dr. Aftab's professional specialization.  *See, e.g., Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266–67 (S.D.N.Y. Nov. 22, 2016) (ALJ's failure to consider factors such as specialization in assessing weight afforded to treating physician's medical opinion warranted remand); *Saldin v. Colvin*, No. 13-CV-4634 (ADS), 2014 WL 3828227, at *13–14 (E.D.N.Y. Aug. 4, 2014) (ALJ erred by failing to consider relevant factors including specialization of treating physician).  Although the ALJ identified Dr. Aftab as a psychiatrist twice, *see* AR at 1961–62, these passing references fall short of meeting his obligation to explicitly consider this *Burgess* factor.  *See Denver v. Berryhill*, No. 19-CV-1312 (AJN) (KHP), 2020 WL 2832752, at *2 (S.D.N.Y. June 1, 2020) (finding that specialization in a certain field is a factor "that the ALJ *must* give express consideration to in order to justify overriding the opinion of a treating physician").  Accordingly, by failing to analyze three of the four *Burgess* factors before giving Dr. Aftab's 2013 opinion less-than-controlling weight, the ALJ violated the treating physician rule.

### a. The ALJ Failed To Provide Good Reasons For Assigning "Little Weight" to Dr. Aftab's Opinion

Moreover, it cannot be said that the ALJ provided good reasons for his weight determination of Dr. Aftab's 2013 opinion.[10] *See, e.g., Pines v. Colvin*, No. 13-CV-6850 (AJN), 2015 WL 1381524, at *3 (S.D.N.Y. Mar. 25, 2015) ("Due to the importance of the treating physician rule, the Second Circuit has made clear that it will 'not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion and it will continue remanding when it encounters opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.'") (alterations omitted) (quoting *Halloran*, 362 F.3d at 33); *Snell*, 177 F.3d at 133 ("Failure to

---

[10] Judge Castel previously held in his 2017 decision that substantial evidence supported the ALJ's decision to accord less-than-controlling weight to his April and September 2010 opinions due to internal inconsistencies and a lack of supporting evidence provided by Dr. Aftab.  *Newell,* 2017 WL 1200911, at *7; AR at 2094. Judge Castel's ruling on the April and September 2010 opinions is the "law of the case" and need not be revisited under that doctrine absent a "compelling" or "cogent" reason such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Morales v. Berryhill*, No. 17-CV-9315 (JLC), 2018 WL 6381049, at *22 (S.D.N.Y. Dec. 6, 2018) (quoting *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)) (internal quotation marks omitted); s*ee also Martinez v. Comm'r of Soc. Sec.*, No. 18-CV-01570 (KHP), 2019 WL 3852439, at *7 (S.D.N.Y. Aug. 16, 2019) (finding scope of review on limited remand in a Social Security appeal is "narrowed to issues not explicitly or implicitly decided in prior proceedings, by application of the 'law of the case' doctrine.").  Because these circumstances do not exist here, Judge Castel's ruling on the April and September 2010 opinions is controlling in this case and will not be revisited.

provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (citing *Schaal,* 134 F.3d at 505).

Here, the ALJ assigned "little weight" to Dr. Aftab's 2013 opinion on the grounds that it was "unclear" and inconsistent with Newell's work activity.  AR at 1980.  Besides summarizing the limitations found by Dr. Aftab in his 2013 opinion —*i.e.*, Newell "is not precluded for 15% or more of an eight-hour workday for any specific mental function" but that he "is only precluded for 10% of an eight-hour workday in the ability to understand, remember, and carry out detailed instructions . . . and travel in unfamiliar places and use public transportation"—the ALJ did not explain what is "unclear" about this opinion.  The Commissioner provides no clarity on this point in his brief and, instead, simply repeats this finding and states in a conclusory fashion that the ALJ provided "good reasons" for discounting Dr. Aftab's opinion.  Def. Mem. at 23–24.  While the Court could speculate about the ALJ's basis for finding Dr. Aftab's opinion "unclear," it would be inappropriate to do so.  It is the ALJ's obligation to provide enough specificity for the Court to determine whether the ALJ had "good reasons" to accord little weight to Dr. Aftab's 2013 opinion.  *See, e.g.*, *Estrella*, 925 F.3d at 95 (requiring "that the crucial factors in any determination . . .  be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence") (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).  The ALJ  failed to do so in his decision.

46

The ALJ also reasoned that Dr. Aftab's opinion deserved less-than-controlling weight because the limitations Dr. Aftab assigned to Newell—including limitations in his ability to understand and carry out detailed instructions and maintain concentration for extended periods of time—did not preclude him from working in a religious bookstore or as a pizza delivery clerk since his disability onset date.  AR at 1980.  On this point, the ALJ failed to take into account the circumstances surrounding Newell's work.  As an initial matter, Newell worked as a volunteer— not an employee—in these positions in exchange for free rent and meals.  *See, e.g., id.* at 1957 (affidavit from Angelo Siderias stating that Newell occasionally delivers pizza for Napoli Family Restaurant & Pizzeria in exchange for food); *id.* at 2035-36 (Newell testifying that he volunteered at the bookstore three days a week in exchange for free rent).  Moreover, the ALJ did not acknowledge portions of the record that established Newell could not take on certain responsibilities in these positions, and that appears to be consistent with Dr. Aftab's 2013 findings.  *See, e.g., id.* at 2057 (Newell reported stress related to his pizza delivery work because "sometimes he gets lost"); *id.* at 2532 (Newell disclosed that while working at the religious bookstore, he did not fully understand how to operate an "iPad which ha[d] some kind of financial tool attached to it"); *id.* at 2034, 2040–41 (Newell testified that he "messed up on the register most of the time" while working at the bookstore and did not understand how to work the credit card function on the cash register).[11]

---

[11] Magistrate Judge Freeman also previously highlighted in her Report and Recommendation that the ALJ "overstated the extent of [Newell]'s activities of daily living."  *Newell,* 2017 WL 9538171, at *32.  She noted Newell's difficulties with

Accordingly, the fact that Newell maintained these positions, without more, does not establish the requisite "good reasons" for discounting Dr. Aftab's opinion.

The ALJ also concluded that "no adequate explanation or cited clinical findings" supported Dr. Aftab's statement that Newell would be "off-task" for 15% of an eight-hour workday and absent from work more than six days per month.  *Id.* at 1980.  To support this finding, the ALJ reasoned that "Dr. Aftab's opinions are regularly accompanied by treatment notes with no consistent mental status examination clinical findings"; however, this reasoning is contradicted by the very next sentence in which the ALJ admits that Dr. Aftab's treatment notes are illegible.  *Id.*  To the extent the ALJ took issue with the fact that there were no legible treatment notes providing additional details supporting his 2013 opinion, courts in this District have explained that a treating physician's "failure to include individualized support for the findings in his evaluation 'does not mean that such support does not exist.'"  *See Rodriguez v. Berryhill,* No. 16-CV-9951 (JPO), 2018 WL 1508739, at *3–4 (S.D.N.Y. Mar. 27, 2018) (quoting *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998)).  Ultimately, while Dr. Aftab's notes may be illegible, this fact alone does not undermine his 2013 opinion; in fact, as discussed above, his findings are supported by other evidence in the record that was not discussed by the ALJ, including Dr. Helprin's 2009 and 2015 opinions.

---

driving, taking public transportation, cleaning his apartment, preparing his own meals, maintaining adequate personal hygiene, and managing his personal finances.  *Newell,* 2017 WL 9538171, at *30.

In sum, the ALJ erred by improperly applying the treating physician rule and failed to articulate "good reasons" for affording "little weight" to Dr. Aftab's 2013 opinion.

### b. The ALJ's Application of the Treating Physician Rule Was Not Harmless Error

The ALJ's error in failing to properly analyze Dr. Aftab's opinion under the treating physician rule was not harmless.  Indeed, the proper application of the treating physician rule is potentially dispositive in determining whether Newell is disabled within the meaning of the Act.  *See, e.g.*, *Roman v. Saul*, No. 19-CV-3688 (JLC), 2020 WL 4917619, at *20 (S.D.N.Y. Aug. 21, 2020) (finding that ALJ's analysis was not harmless error because had the ALJ credited the treating physician's opinion, the VE determined that it may have resulted in claimant's inability to work).  Dr. Aftab's opinion that Newell had limitations in his ability to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods of time, *id.* at 895–98, if credited, would be dispositive as VE Burger testified that a person with difficulty understanding instructions as well as attention and concentration limitations could not perform any job.  *Id.* at 2048; *see, e.g., Pines*, 2015 WL 872105, at *10 (concluding that ALJ's analysis was not harmless error because "the [vocational expert] essentially testified that if these opinions were adopted, [the claimant] would be unable to work") (quoting *Archambault v. Colvin*, No. 2:13-CV-292, 2014 WL 4723933, at *10 (D. Vt. Sept. 23, 2014), *adopted by* 2015 WL 1381524 (Mar. 25, 2015)); *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("ALJ's failure to provide adequate reasons

for rejecting [treating physician's] opinion was not harmless" because "vocational expert . . . testified that [plaintiff] could perform no jobs available in large numbers in the national economy if he had to miss four or more days of work per month").

### 2. The ALJ's Step Three Finding Must Be Reconsidered in Light of the ALJ's Error in Applying the Treating Physician Rule

Because the ALJ violated the treating physician rule, the Court need not decide whether substantial evidence supports the ALJ's finding that Newell does not meet a listing requirement under Step Three. However, on remand, the ALJ should reexamine the requirements under Listing 12.05B, as necessary, in light of Newell's treating physicians' opinions and all other relevant medical evidence in the record.

In analyzing Newell's impairments at this step, the ALJ considered Listing 12.05B. AR at 1966–72.[12] This Court will review the ALJ's Listing 12.05B decision as Listing 12.05C was not in effect at the time the ALJ issued the August 2019 opinion.[13] Listing 12.05B requires the following:

---

[12] Listing 12.05 was revised to eliminate Paragraph C effective January 17, 2017. *See* 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016). Accordingly, at the time of the ALJ's August 2019 decision, Listing 12.05 only had Paragraphs A and B.

[13] The SSA "expects that Federal Courts will review [its] final decisions using the rules that were in effect at the time [it] issued the decisions." *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 n.1 (Sept. 26, 2016); *see, e.g., Randolph v. Berryhill*, No. 17-CV-6711 (BCM), 2019 WL 1434301, at *7 (S.D.N.Y. Mar. 29, 2019) (referring to the listings in effect at the time of the ALJ's decision). Additionally, if a court reverses and remands an SSA decision "for further administrative proceedings after the effective date of these [] rules, [the SSA] will apply these [] rules to the entire period at issue in the decision we make

(1) Significantly subaverage general intellectual functioning evidenced by a full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence;

(2) Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (a) understanding, remembering, or applying information; or (b) interacting with others; or (c) concentrating, persisting, or maintaining pace; or (d) adapting or managing themselves; and

(3) The evidence about claimant's current intellectual and adaptive function and about the history of his disorder demonstrates or supports the conclusion that the disorder began prior to his attainment of age 22.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.05B.  A marked limitation means a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.  An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis."  AR at 1966.

As an initial matter, the ALJ did not directly address the first or third requirements and instead decided whether Newell satisfied Listing 12.05B based only on the second requirement.  The ALJ found that Newell did not satisfy this second prong—whether Newell had significant deficits of adaptive functioning—

---

after the court's remand."  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 n.1.

because he had only moderate limitations in two functional areas (understanding,
remembering, or applying information and concentrating, persisting, or
maintaining pace) and mild limitations in the other two functional areas
(interacting with others and adapting or managing oneself). *Id.* at 1966, 1969–70.
In making this assessment, the ALJ considered the consultative opinions of Drs.
Fine, Helprin, Mata, and Figueroa. *Id.* at 1966–70. Although Dr. Helprin opined
that Newell had marked limitations in the ability to maintain attention and
concentration, the ALJ ultimately dismissed this portion of her opinion on the
grounds that it was not supported by substantial evidence. *Id.* at 1978–79.

However, in evaluating Newell's deficits in adaptative functioning, the ALJ
failed to consider portions of the record that supported Dr. Helprin's finding of
"marked" limitations. For example, Dr. Aftab's 2013 opinion established Newell's
inability to understand, remember, and carry out detailed instructions, travel in
unfamiliar places, or use of public transportation for 10% of an eight-hour workday,
and that Newell would not be able to obtain and retain work in a competitive work
environment due to his impairments. *Id.* at 896–98. In addition, Dr. Krieg reported
that Newell was exhibiting "worsening depressive symptoms," which caused him to
modify Newell's diagnosis from "Depression, major, recurrent, mild" to "Depression,
major, recurrent, moderate." *Id.* at 2974, 2976. Moreover, Bachenheimer's
treatment notes demonstrate that Newell had difficulty in adapting and
maintaining a regular schedule, and in managing himself. *See, e.g., id.* at 2531
(discussing Newell's inability to "follow-through" at work and noting on November

19, 2018 that Newell's landlord told Newell that "he ha[d]n't put in as many hours as he would like"); *id.* at 1138–39 (noting twice in 2013 that Newell has poor hygiene and only washed his clothes once a month).  Rather than address the evidence from these treating professionals that tend to support Dr. Helprin's "marked" limitation finding, the ALJ relied solely on consultative and reviewing psychiatrists' opinions.  *Id.* at 1966, 1969–70.

Without knowing what weight would be afforded to Dr. Aftab's 2013 opinion following the proper application of the treating physician rule, however, the Court cannot reach a conclusion as to the ALJ's finding as to Listing 12.05B.  Accordingly, the ALJ should revisit Listing 12.05B after properly determining what weight to give to Dr. Aftab's 2013 opinion.

### 3.  The Case Is Remanded For Further Proceedings

The Court is mindful of Newell's request for this case to be remanded solely for the calculation of benefits, particularly given that it was first filed nearly a decade ago.  However, "a calculation-only remand is appropriate when the record . . . 'provides persuasive evidence . . . that render[s] any further proceedings pointless.'"  *Vasquez o/b/o A.T.R. v. Saul*, No. 16-CV-4791 (ENV), 2020 WL 2933857, at *6 (E.D.N.Y. June 2, 2020) (citing *Williams*, 204 F.3d at 50).  "[I]n a case where, as here, there is conflicting medical evidence, remand simply for the calculation of benefits is unwarranted."  *Roman v. Berryhill*, No. 17-CV-2804 (VSB) (DCF), 2018 WL 7291422, at *9 (S.D.N.Y. May 9, 2018) (citing *De La Cruz v. Colvin,* 16-CV-3954 (AT) (HBP), 2017 WL 2270250, at *2–3 (S.D.N.Y. May 3,

2017)), *adopted by* 2019 WL 588464 (Feb. 13, 2019).   Remanding solely for the calculation of benefits "is considered an extraordinary action," and, given the issues still to be resolved, is not appropriate at this juncture of the case.   *Robinson ex rel A.A.M. v. Comm'r,* No. 19-CV-6172 (JJM), 2020 WL 4333339, at *6 (W.D.N.Y. July 28, 2020).

### III.  CONCLUSION

For the foregoing reasons, Newell's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).   On remand, the ALJ should:

(1) Provide a comprehensive analysis, including explicit consideration of all of the *Burgess* factors, in determining how much weight to assign Dr. Aftab's 2013 opinion; and

(2) Reexamine the requirements under Listing 12.05B in light of Newell's treating physicians' opinions and all other relevant medical evidence.

**SO ORDERED.**

Dated: February 17, 2021
      New York, New York

_____
JAMES L. COTT
United States Magistrate Judge